[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff and defendant marries in Waterbury, Connecticut, on July 4, 1980, approximately eleven years ago. It was his first marriage, her second. Plaintiff has resided continuously in this state for the past twelve months. Neither plaintiff nor defendant are the CT Page 7639 recipients of public assistance from the State of Connecticut or of any governmental subdivision.
There is one minor child of this marriage, Edward A. Hawthorne, III, born November 16, 1984, who will be seven years of age one month from today.
This court finds that the marriage has broken down irretrievably and that the cause of the breakdown was Mr. Hawthorne's physical abuse and his patterns of intimidation. Plaintiff wife testifies to a life of marital abuse, temper tantrums and intimidation. Despite evidence to the contrary, husband denies all her claims, admitting only that he did gouge the sofa as shown in Plaintiff's Exhibit C. He denies gouging the rugs, the hutch, the table, or family photographs. He beating his wife, son or his wife's daughter. He denies years of abuse.
In letter written by Mr. Hawthorne to his wife (Plaintiff's Exhibit F) he speaks of his "uncontrollable temper", admits "I need professional help" and concludes with "you didn't deserve all those years of abuse."
In a letter written to his step-daughter, Jennifer (Plaintiff's Exhibit B) Mr. Hawthorne writes "I have a very abnormal temper and I need help to get it under control. . . I put your mother through hell for quite a few years. . .I just hope I didn't have a real negative effect on your life. I'm not the best father but hopefully I'll get better and make it up to you."
When asked by the court, Mr. Hawthorne denied having an uncontrollable temper and testified that he had not sought professional help other than a brief period of marital counseling.
Plaintiff wife is the more credible witness, particularly when the testimonial demeanor of each spouse is considered and butressed by earlier court history, photographic exhibits, letters written by defendant and the testimony of plaintiff's father.
Mr. Hawthorne has learned that irrational and violent behavior is so threatening to his moderate and non-confrontational wife that she will do whatever is necessary to avoid his continuing irrational violence. When he did not want Mrs. Hawthorne's sister to attend their infant son's christening, he physically took the infant from the home, threatened not to return him, and called the frantic mother from time to time, repeating the threat and refusing to tell her where he had taken the infant. The terrified mother relented and her husband returned the boy.
When his young son did not agree to behave as he demanded, the father threatened to give away the boy's puppy — or the father broke CT Page 7640 toys. Both mother and the family relations officer spoke of more than one broken toy. Father admitted to just one.
When his wife fled the family home after physical abuse, he threatened to destroy one piece of furniture every day she stayed away. He then held the phone near the sofa so she could hear him ripping it with a knife.
Behavior of this sort is so irrational, so violent, so controlling it borders on terrorism. And it produces the same results. The victim is cowed. The victim obeys. A terrified mother permits the abusive father to have more visitation than her good sense approves. She does it to gain peace. She does it to avoid confrontation. And in doing it she exposes her son to an abusive father and, perhaps, instructs the next generation in the rewards of abusive behavior. The young son becomes both a victim and a student of his father's violence, directly and indirectly.
Although testimony was offered of Mr. Hawthorne's misuse of alcohol, his attendance at Alcoholics Anonymous meetings, Mrs. Hawthorne's attendance at Al Anon and her daughter's attendance at Alateen, the court enters no finding with regard to that allegation.
Defendant signed a marriage license giving his occupation as a doctor. He was not. His age was represented as 29. It was 24. His mother's maiden name was given as Geralding DeFippo. It was not. Mr. Hawthorne denied any role in the misstatements. The issue went no further.
The court was offered a Family Relations Office evaluation of the parents and child which contained a number of concerns about the father's behavior. The interviews that comprised the study were completed in June of 1990. The report was written and circulated in June of 1991 and was offered to the trial court on September 10th of 1991, fifteen months after the interviews. Our Appellate Court, in O'Neill vs. O'Neill, 13 Conn. App. 300 (1988) found a thirteen month old family relations evaluation to be an invalid basis for a trial court's conclusion. At page 303 it quotes In re Juvenile Appeal (Anonymous),177 Conn. 648, 664 (1979):
 "[T]he court [is] bound to consider the child's present best interests and not what would have been in her best interests at some previous time." (Emphasis in original.)
Thus, this court is unable to rely upon the recommendations of the Family Relations report. The value of the early efforts invested by Family Relations Officer Sharon Copes would have been preserved had there been follow-up interviews prior to the court hearing. It is unfortunate that the office, though invited to do so by the defendant father's counsel, did not bring the interviews current. CT Page 7641
Fortunately, the evidence available during the trial provided sufficient information for the court to feel comfortable proceeding without reliance upon the Family Relations report.
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, a finding shall enter that the marriage has broken down irretrievably, a decree of dissolution shall enter and the following orders shall apply:
1. CUSTODY
a. Custody of the minor child, Edward A. Hawthorne, III shall be solely with the plaintiff mother, Joyce S. Hawthorne.
2. The parties have not agreed to an award of joint custody nor have they so agreed during the hearing in open court. To the contrary, each of the parties have repeatedly testified to their difficulty in communicating and cooperating. This court finds it would not be in the best interest of the minor child, Edward, for joint custody to be awarded.
c. Although father may be consulted on major decisions involving schooling, religious instruction and medical procedures, mother is empowered to make all such decisions.
2. VISITATION
a. Defendant father, who lives in East Haven, shall have visitation with the minor child every other Thursday evening from 3 P.M. to 7 P.M. and alternate week-ends from Friday at 3 P.M. until Sunday at 6 P.M. Thursdays shall be exercised during those weeks defendant father does not have week-end visitation.
b. Parents shall alternate Easter Sunday, Thanksgiving Day, Christmas Eve and Christmas Day as follows:
 Easter Sunday 1991: Father (10 A.M. to 6 P.M.)
 Thanksgiving 1991: Mother (10 A.M. to 6 P.M.)
 Christmas Eve 1991: Father (5 P.M. to 10 A.M.)
 Christmas Day 1991: Mother (10 A.M. to 6 P.M.) CT Page 7642
c. Father shall have two non-consecutive weeks of vacation with young Edward. Arrangements shall be made at least 60 days in advance by mutual agreement of both parents.
d. If, in the judgment of the custodial parent, the minor child's other schedules make any of the visitations in a, above, inappropriate, she is empowered to change the visit upon one week's advance notice to father. If any such change is made, mother shall offer no less than two reasonable alternate dates within two weeks of the original date so that father can choose a substitute visit.
e. All child exchanges shall take place at the home of plaintiff's parents in Waterbury or at any other location of plaintiff's choice. Defendant is to provide the transportation.
f. None of the terms of this order are to be interpreted as permitting defendant to enter upon plaintiff's premises in Wolcott.
g. No verbal messages between the parents are to be passed through the minor child.
3. CHILD SUPPORT
a. Father shall pay child support of $100 per week to the plaintiff mother. Because the combined net incomes of the parties exceed its $1500 weekly limit, the Child Support Guidelines are found to be inapplicable.
b. All child support payments are to be made by way of wage executions.
c. The court finds father is in arrears in child support payments in the amount of $2750 as of September 9, 1991.
4. FAMILY HOME
a. Title to the family home at 53 Woodward Road, Wolcott, Connecticut is hereby transferred to the plaintiff wife pursuant to C.G.S46b-81(a).
b. Plaintiff shall hold defendant harmless with respect to the mortgages, taxes, insurance and all costs associated with said property.
c. Said family home has a fair market value of $170,000 and mortgages of $123,000, creating an equity of $47,000. One-third of that equity, or $15,700 is hereby assigned to defendant, to carry an interest rate of 6% per annum from the date hereof, payable upon plaintiff's remarriage or death, or upon young Edward's graduation from college, whichever shall first occur. Interest of $942 shall be CT Page 7643 paid to defendant annually on or before each anniversary of this judgment.
 The financial stability of the plaintiff enables her to offer her son a secure environment, with limited financial stress. Defendant's financial history is far less comforting. His earnings, during the history of the marriage, average approximately one-third those of his wife.
 The court, however, is concerned the Mrs. Hawthorne's income is being earned in an industry that operated under a serious cloud. Banks are closing and consolidating. Jobs are being eliminated, particularly higher salaried executive positions such as Mrs. Hawthorne's.
 While recognizing that Mrs. Hawthorne enjoys a good income, that concern has led the court to use the more extended and traditional payoff formula for the payment of Mr. Hawthorne's equity in the family home.
d. Plaintiff's counsel shall prepare a mortgage deed and note reflecting the terms set forth herein, as well as traditional clauses, and defendant may record same in the Wolcott land records.
e. Defendant shall permit plaintiff to refinance her existing mortgages on 53 Woodward Road, Wolcott, as well as to place subsequent financing thereon. Defendant shall subordinate to said financing.
5. MEDICAL INSURANCE
a. Plaintiff shall provide medical insurance coverage for the minor child as available through her place of employment. If none is available to plaintiff as an employment benefit, defendant shall provide same.
b. Uninsured medical, dental prescription, mental health, eye care, and all other uninsured health care costs shall be divided equally by the parents.
c. The provisions of C.G.S. 46b-84(c) shall apply.
6. LIFE INSURANCE
a. Defendant shall maintain $50,000 of insurance of his life, payable to Joyce S. Hawthorne, Trustee for the benefit of Edward A. Hawthorne, III, as irrevocable beneficiary.
b. At plaintiff's request, defendant will provide evidence annually CT Page 7644 that said insurance is in full force and effect.
c. If defendant dies without said beneficiary receiving the $50,000 life insurance benefits, defendant's estate shall be liable therefor.
7. PERSONAL PROPERTY
Each of the parties shall retain title to all of the personal property now within their control.
8. ATTORNEY FOR THE MINOR CHILD
a. Attorney Charles F. Senich has billed $2100 for his legal services. The court approves that bill.
b. Each of the parties shall be responsible for one-half of said bill. Any insurance benefit derived by Mr. Hawthorne shall be credited to his share of the bill.
c. Payment in full is to be made within thirty days of receipt of Attorney Senich's bill.
9. DEBTS
Each of the parties is responsible for the payment of those liabilities listed in their own sworn financial affidavit dated September 10, 1991, section 3, and shall hold the other harmless therefrom.
10. ESCROW
a. The law office of Gager and Henry is holding an escrow sum of approximately $9000 for the parties.
b. The escrow sum is to be divided equally between plaintiff and defendant.
c. Before any portion of Mr. Hawthorne's share of the escrow fund is distributed to him, his $2750 child support arrearage is to be paid to plaintiff, the cost of reupholstering the sofa he admitted slashing is to be paid to plaintiff, and, then from any balance that balance, if any, shall then be given to Mr. Hawthorne.
11. MODIFICATION
Should the father, with the passage of time, and the maturing of young Edward, seek more extensive visitation sometime in the future, it would be the hope of this court that Mr. Hawthorne would follow his own stated need and seek professional help. Having both parents as CT Page 7645 well as the minor child participate over a period of time with an experienced psychiatrist or psychologist would likely be seen by a future court as a helpful as a helpful and positive development.
12. APPEAL
All foregoing orders with respect to custody and visitation shall stand and operate as interim orders of the court during the pendency of any appeal.
Joseph L. Steinberg, Judge